**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholaus Rosonke, | No. CV-24-03663-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Justin Pappan, et al., | |
| Defendants. | |

On March 7, 2025, Defendant Justin Pappan, Watts Operations, LLC, and Social Reflect Corporation (collectively, "Defendants") filed a Motion to Compel Arbitration and Motion to Transfer Venue. (Doc. 11). Plaintiff Nicholaus Rosonke ("Plaintiff") filed a Response (Doc. 16) opposing Defendants' Motion, and Defendants thereafter filed a Reply (Doc. 18).

## I.    Background

Plaintiff's Complaint arises from an employment dispute with Defendants. (*See generally* Doc. 1). Plaintiff claims he was not compensated for the work he performed for Defendants. (*Id.*) In response, Defendants submit a contract that they believe governs the adjudication of Plaintiff's claims and compels arbitration or a change of venue. (*See generally* Doc. 11).

### A.    Plaintiff's Complaint

Plaintiff alleges that, at all relevant times, each Defendant was his "employer" and that he was their "employee." (Doc. 1 at ¶¶ 2–5). Defendant Justin Pappan ("Defendant

Pappan") is alleged to be the "sole shareholder" of Defendant Social Reflect Corp. ("Defendant SRC"), the "sole member/manager" of Defendant Watts Operations, LLC ("Defendant Watts"), and "the day-to-day decisionmaker for all material business decisions for both entities." (*Id.* at ¶ 6). Plaintiff alleges that "these parties were sufficiently interrelated that all three Defendant[s] may be held jointly and severally liable as a "common enterprise" or "joint employer" and/or agents of one another with respect to Plaintiff for purposes of all of the causes of action herein." (*Id.*)

Defendants "own and manage a fleet of private rental cars that are platformed through the Turo application." (*Id.* at ¶ 14). In 2022, Plaintiff says he relocated to Arizona from Iowa, having been verbally promised by Defendant Pappan a role as operations manager that would match or exceed his previous annual income of $150,000. (*Id.* at ¶¶ 13, 15, 17). Upon starting his employment with Defendants, Plaintiff alleges that he "worked seven days a week, often for 10-12 hours a day," and that his duties included "handling customer bookings of the cars, washing and maintaining cars, and resolving operational issues." (*Id.* at ¶¶ 20–21).

As to compensation, Plaintiff alleges that he was "provided a room…and a limited monthly food budget." (*Id.* at ¶ 19). However, his request to Defendants for payment based on his hours worked was unsuccessful, despite Defendants having no excuse for their refusal to pay. (*Id.* at ¶¶ 23–24). Plaintiff resigned in March of 2023 and claims, that same month, he received his only two paychecks, totaling $4,000.00 before withholdings. (*Id.* at ¶ 25). Plaintiff alleges that "Defendants otherwise utterly failed to pay minimum wage or overtime as required," leading to his conclusion that they never intended to pay Plaintiff. (*Id.* at ¶¶ 24, 26).

Consequently, Plaintiff brought suit against Defendants on December 20, 2024, claiming violations of the Fair Labor Standards Act ("FLSA"), Arizona minimum wage violation, Fair Wages and Healthy Families Act violation, fraud, and promissory estoppel. (*Id.* at ¶¶ 28–65). In response to Plaintiff's Complaint, Defendants filed a Motion to Compel Arbitration and a Motion to Transfer Venue. (Doc. 11).

**B.    The Contract**

In support of the Motion to Compel Arbitration, Defendants point to a January 1, 2023, Vehicle Services Agreement ("VSA") entered into between nonparty Social Reflect Operations, LLC ("SRO, LLC") and Defendant Watts.  (*See* Doc. 11-3).  Plaintiff signed the VSA on behalf of SRO, LLC[1] and Defendant Pappan signed on behalf of Defendant Watts.

The VSA identifies SRO, LLC as "Owner" and states that SRO, LLC is "the owner and operator of one or more Tesla motorized electric vehicles."  (*Id.* at 1).  The agreement states that SRO, LLC "desires to utilize certain services offered by Watts to list, promote, and make available the Vehicles for short term use…by individuals…through 'Turo' peer-to-peer car sharing platform…and Watts wishes to provide such services to [SRO, LLC]."  (*Id.*)  The VSA identifies a singular 2022 Tesla that SRO, LLC was seeking to list with Watts (the "Tesla"). (*Id.* at 14).  The VSA requires SRO, LLC to obtain regular maintenance on the identified Tesla, make sure it is clean, drop off and pick up the car, and maintain proper automobile insurance on it.  (*Id.* at 2–4).  The VSA and the attached Form Statement of Work state that for a monthly service charge of $400, Watts would list and promote the Tesla, and, on a monthly basis, pay SRO, LLC a "Platform Revenue" generated through the Tesla's listings on a monthly basis.  (*Id.* at 12).  The VSA's Form Statement of Work obligates Watts to, among other things, list and promote the Tesla on Turo, store the Tesla between reservations, and collect and manage revenues generated on renting the Tesla.  (*Id.* at 12).

The VSA makes clear that "[t]he parties are independent contractors with respect to each other, and nothing in this Agreement shall be construed as creating an employer-employee relationship, a partnership, fiduciary, or agency relationship or any association or joint venture between the parties."  (*Id.* at ¶ 11).  The VSA includes an arbitration

---

[1] The Court will take judicial notice of Doc. 11-4, the Articles of Organization for Social Reflect Operations LLC, showing Plaintiff as the sole member of the member-managed entity. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (noting that a court may take judicial notice of matters of public record without converting the motion into one for summary judgment).

1    agreement that states:

2        This Agreement and the relationship between the parties shall be construed
3        under and governed by the laws of the State of Arizona, as if the Agreement
         was entered into and fully performed therein, without regard to the conflict
4        of law rules thereof. The parties agree that any dispute shall be finally settled
5        by binding arbitration in Santa Clara County, California under the Federal
         Arbitration Act (9 U.S.C. §§ 1-307) and the then current rules of JAMS
6        (formerly known as Judicial Arbitration & Mediation Services) by one (1)
7        arbitrator appointed in accordance with such rules. Where arbitration is not
         required by this Agreement, the exclusive jurisdiction and venue of any
8        action with respect to the subject matter of this Agreement will be the state
9        and federal courts located in Santa Clara County, California, and each of the
         parties hereto waives any objection to jurisdiction and venue in such courts.
10       In any dispute resolution proceeding between the parties in connection with
         this Agreement, the prevailing party will be entitled to recover its reasonable
11       attorney's fees and costs in such proceeding from the other party.

12   (*Id.* at ¶ 15).   Defendants have moved to compel arbitration of Plaintiff's employment

13   claims pursuant to the VSA's arbitration provision.   They also invoke this provision as

14   grounds to transfer venue to a California court.  (Doc. 11 at 9).

15   **II.    Legal Standard**

16       The Federal Arbitration Act ("FAA") allows "[a] party aggrieved by the alleged

17   failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration

18   [to] petition any United States District Court . . . for an order directing that . . . arbitration

19   proceed in the manner provided for in [the arbitration] agreement."  9 U.S.C. § 4.  If a party

20   has failed to comply with a valid arbitration agreement, the district court must compel

21   arbitration.  *Id.*  The district court must also stay the proceedings pending resolution of the

22   arbitration at the request of one of the parties bound to arbitrate.  *Id.* at § 3.

23       In determining whether to compel arbitration, the court must limit its review to (1)

24   whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement

25   encompasses the dispute at issue.  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d

26   1126, 1130 (9th Cir. 2000).  If the answer is affirmative on both queries, then the court

27   must enforce the arbitration agreement in accordance with its terms.  *Id.* at 1130.  If a

28   genuine dispute of material fact exists as to these queries, a court should apply a "standard

1    similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]."

2    *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

3         While the scope of an arbitration provision is determined by applying federal law,

4    whether there is a valid agreement to arbitrate is determined "by applying general state-

5    law principles of contract interpretation, while giving due regard to the federal policy in

6    favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of

7    arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

8         Arbitration agreements governed by the FAA are presumed to be valid and

9    enforceable. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987). The

10   party opposed to arbitration bears the burden of showing the arbitration agreement is

11   invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v.*

12   *Randolph*, 531 U.S. 79, 92 (2000).

13   **III.    Discussion**

14        The parties do not dispute that the VSA is a valid contract that contains an equally

15   valid arbitration agreement. (Doc. 11 at 4; Doc. 16 at 1–2). Instead, the primary debate

16   concerning validity is whether the Defendants can enforce the arbitration provision against

17   Plaintiff, who is not a signatory to the VSA.

18        "Nonparties to a contract are generally not bound by an arbitration agreement."

19   *Benson v. Casa De Capri Enterprises, LLC*, 502 P.3d 461, 464 (Ariz. 2022). However,

20   "'nonsignatories of arbitration agreements may be bound by the agreement under ordinary

21   contract and agency principles.'" *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir.

22   2006) (quoting *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187 (9th Cir.

23   1986)). State law, in this case Arizona's, governs whether a nonsignatory is bound by an

24   arbitration agreement. *Benson v. Casa de Capri Enterprises, LLC*, 980 F.3d 1328, 1331

25   (9th Cir. 2020), *certified question answered*, 502 P.3d 461 (Ariz. 2022). The principles

26   available to bind non-signatories include incorporation by reference, assumption, agency,

27   veil piercing/alter ego, equitable estoppel, and third-party beneficiary. *Id.* (citing *Duenas*

28   *v. Life Care Centers of Am., Inc.*, 336 P.3d 763, 772 (Ariz. App. 2014)).

1          The parties primarily dispute whether equitable estoppel or, more specifically,

2    "direct benefits estoppel" binds Plaintiff to the arbitration agreement.  "Under Arizona's

3    doctrine of direct benefits estoppel, a non-signatory may be bound to the terms of a contract

4    when the non-signatory (1) knowingly exploits the benefits of an agreement ..., or (2) seeks

5    to enforce terms of that agreement or asserts claims that must be determined by reference

6    to the agreement."  *Id.* (quoting *Austin v. Austin*, 237 Ariz. 201, 348 P.3d 897, 906 (Ariz.

7    Ct. App. 2015)) (internal quotation marks omitted).  Defendants argue that Plaintiff's

8    claims for compensation and his claim that he is Defendant's employee must be determined

9    by reference to the VSA.  (Doc. 11 at 6).  Plaintiff disagrees and argues that the VSA is

10   wholly separate from his employment claims.  (Doc. 16 at 8).

11          In support of its argument, Defendants cite *Board of Trustees of IBEW Local No.*

12   *640 and Arizona Chapter NECA Health and Welfare Tr. Fund v. Cigna Health and Life*

13   *Ins. Co.*, 2022 WL 2805111, *1 (9th Cir. 2022).  The plaintiff there alleged that the

14   defendant schemed to obtain more compensation than it was entitled to and charged

15   excessive fees to the ERISA plan.  *Id.* at *1.  The Ninth Circuit affirmed the district court's

16   conclusion that "that the ERISA plan at issue, even if separate from the Fund, is equitably

17   bound by the Fund's agreement to arbitrate under the principle of direct benefits estoppel."

18   *Id.* (internal citation omitted).  In so ruling, the court explained that "[d]etermining what

19   compensation defendant was 'entitled to' or whether its fees were 'excessive' is impossible

20   without reference to the Administrative Services Only [] Agreement, which specifies the

21   fees that [defendant] may charge."  *Id.*

22          In contrast, the court in *RLI Ins. Co. v. Natl. Constr. & Dev., Inc.*, 560 P.3d 330

23   (Ariz. Ct. App. 2024) ruled that an arbitration agreement contained in a construction

24   contract could not be enforced against a nonsignatory plaintiff on the basis of direct

25   benefits estoppel.  *Id.* at 337.  There, the construction contract was entered into between

26   the defendant construction company and an individual.  *Id.* at 333.  After the individual

27   failed to pay the defendant's invoice and defendant filed a lien, the individual secured a

28   "statutory discharge of lien bond" from the nonsignatory plaintiff.  *Id.*  The defendant

1    attempted to compel arbitration with the plaintiff, arguing that "direct benefits estoppel

2    applies because [plaintiff's]'s obligations 'arise[ ] out of [the individual's] contractual

3    obligation to pay [defendant] for the work it performed.'" *Id.* at 337.  The court disagreed,

4    stating that "[plaintiff's]'s obligations arise from § 33-1004, the notice and claim of lien,

5    and the bond agreement itself; they do not arise from the construction contract." *Id.*

6    Ultimately, the court concluded that the defendant had "not shown that either prong of the

7    estoppel standard applies here: there is no suggestion that [plaintiff] exploited a benefit

8    deriving from the construction contract, or that [plaintiff] was seeking to enforce terms of

9    the construction contract." *Id.*

10         The circumstances here are more analogous to those in *RLI* rather than those in

11   *IBEW*.  Plaintiff claims that Defendant Pappan "operates Defendant companies to own and

12   manage a fleet of private rental cars…through the Turo application." (Doc. 1 at ¶ 14).  He

13   further asserts that Defendant Pappan verbally promised him "a role as operations

14   manager[.]"  (Doc. 1 at ¶ 15).  His alleged duties for Defendants included "handling

15   customer bookings of the cars, washing and maintaining cars, and resolving operational

16   issues."  (*Id.* at ¶ 21).  Plaintiff maintains that he was not appropriately compensated for

17   this work.  (*See id.* at ¶¶ 23–26).  His Complaint alleges several statutory claims for

18   compensation as well as claims related to the alleged verbal promise.

19         By comparison, the VSA came about because "[SRO, LLC] desire[d] to utilize

20   certain services offered by Watts to list, promote, and make available the

21   Vehicles…through the 'Turo' peer-to-peer car sharing platform…and Watts wishes to

22   provide such services to [SRO, LLC]." (Doc. 11-3 at 2).  The VSA concerns the listing of

23   a singular vehicle owned by Plaintiff and, essentially, amounts to a property management

24   agreement.  Indeed, SRO, LLC's responsibilities are limited to standard upkeep of the

25   vehicle, including "obtaining regularly scheduled maintenance of the Vehicles" and

26   "making sure the Vehicles are clean at the start of each Listing Period." (*Id.* at 3–4).  The

27   VSA stipulates that SRO, LLC is to pay Watts a monthly service fee of $400 for the Tesla,

28   and Watts would pay the monthly "Platform Revenue" generated through the Tesla listings

1    to SRO, LLC.  (*Id.* at 12).

2        Plaintiff states that he had "no formal written employment agreement of any kind

3    with any of the named Defendants at any time[.]"  (Doc. 16-1 at 2).  And the allegations

4    regarding the terms of the verbal agreement in the Complaint are sparse.  But the VSA does

5    not serve as the basis for Plaintiff's employment claims in the absence of a written

6    employment agreement.  In *IBEW*, the plaintiff's claims squarely referred to the fees that

7    were governed under an existing agreement, whereas here the wages and compensation

8    sought by Plaintiff are not dictated by the VSA.  The VSA is a narrow agreement

9    concerning the rental of a singular car and is no way implicated by Plaintiff's employment

10   claims.  Like *RLI*, Defendants' alleged obligation to pay Plaintiff arises out of a source

11   separate from the VSA—the alleged verbal employment contract.

12       Simply put, Plaintiff is not attempting to enforce the terms of the VSA or seek

13   recovery from any non-payment or other breach related to the management or listing of his

14   Tesla.  *See Legacy Carbon LLC v. Potter*, 2017 WL 3710787, *7 (D. Hawai'i 2017)

15   ("Cases applying direct benefits estoppel tend to involve nonsignatories asserting claims

16   against signatories based on the underlying agreement."); *Jurosky v. BMW of N.A., LLC*,

17   441 F. Supp. 3d 963, 970 (S.D. Cal. 2020) (finding equitable estoppel inapplicable to

18   compel a purchase agreement's arbitration provision in part because the plaintiff alleged

19   "no duty, obligation, term, or condition imposed by the purchase agreement that [the

20   defendant] breached").[2]  Stated in another way, any recovery that may have been obtained

21   from a breach of the VSA would in no way impact the recovery of unpaid wages at the

22   heart of Plaintiff's Complaint.  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1131 (9th

23   Cir. 2013) (declining to apply equitable estoppel to compel arbitration where the plaintiffs'

24   implied warranty claims against the defendant arose independently of the purchase

25   agreements).

26       In sum, the Court can establish the nature of Plaintiff's employment and determine

27

28   _____
[2] Given the "dearth of Arizona precedent on this subject," the Court will consider the well-reasoned decisions of other jurisdictions. *See Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 260 (5th Cir. 2014)

the total compensation owed to Plaintiff for his alleged hours worked without reference to the VSA.  Thus, Plaintiff is not bound by the arbitration agreement under direct benefits estoppel, and compelling arbitration is inappropriate under these circumstances.  Because Defendants' Motion to Transfer is based on the VSA and the Court has determined that it is not applicable here, Defendants' Motion to Transfer is also denied.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Compel Arbitration and Transfer Venue (Doc. 11) is **DENIED**.  An Order setting a Rule 16 Scheduling Conference will issue by separate Order.

Dated this 9th day of December, 2025.

Honorable Diane J. Humetewa
United States District Judge